**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John Joseph BARONE, Jr.,
Defendant-Appellant.**

No. 77–5238.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 3, 1978.

Decided Aug. 1, 1978.

Rehearing and Rehearing En Banc
Denied Sept. 26, 1978.

Keith, Circuit Judge, dissented with an opinion.

Joseph L. Arnold, Nunn, Odear & Arnold, Lexington, Ky., John Czarnecki, Hayward, Cooper, Straub, Cramer & Co., Toledo, Ohio, John Kennedy Lynch, Cleveland, Ohio, for defendant-appellant.

Patrick H. Molloy, U. S. Atty., James Arehart, Asst. U. S. Atty., Lexington, Ky., for plaintiff-appellee.

Before CELEBREZZE, ENGEL, and KEITH, Circuit Judges.

ENGEL, Circuit Judge.

John J. Barone, Jr. was convicted of possessing cocaine with intent to distribute it and of conspiring to distribute that drug, in violation of 21 U.S.C. §§ 841(a)(1) and 846. In his direct appeal he raises three issues. He challenges the validity of a search warrant for his residence, claiming that the underlying affidavit contained material misrepresentations of fact made by its affiant and that it was insufficient to establish probable cause for the search. He claims that the grand jury system was abused by the government because the indictment was issued solely upon the hearsay testimony of an investigating officer, and because a grand jury convened earlier in another district had refused to indict after hearing numerous eyewitnesses. Finally, he claims that the district court erred in denying his motion for a new trial based upon a claim that newly-discovered evidence, withheld by the government, would have tended to exculpate him. We affirm.

## THE SEARCH WARRANT

The warrant for the search of Barone's residence was issued by an Ohio state judge upon the affidavit of a special agent of the Drug Enforcement Administration (DEA). The physical evidence seized in the search, a microscope, a triple-beam balance, and a vial of lactose, was not introduced into evidence. Nevertheless, the government made full use of testimony that the triple-beam balance and vial of lactose were discovered in the search and were materials commonly used by persons in the business of distributing drugs.

The government's theory was that Barone and one Norman Richard Depp were partners in cocaine smuggling operations and that in furtherance of this conspiracy, Barone had given Depp $10,000 in cash to travel to Colombia, South America to purchase cocaine. The scheme was discovered when, on July 6, 1975, Depp and one Roma Sly disembarked from a flight at the Miami International Airport, having returned together from a trip to Colombia. Depp and Sly proceeded through customs checkpoints at separate locations. However, customs officials became suspicious when they observed Sly carrying a hair dryer. Disassembling it, they discovered approximately 3.3 pounds of cocaine. Depp was also arrested while leaving the concourse and both were interrogated by DEA agents. The interrogation produced a confession by Depp and his identification of Barone as his partner. Having apprised the agents of their plans, Depp agreed to cooperate in an effort to make a "controlled" delivery to Barone of the cocaine found in the hair dryer. At the agent's urging, Depp called Barone and suggested that they meet at the airport serving Cincinnati, Ohio, which is actually located within Kentucky. The bulk of the cocaine was removed from the hair dryer and replaced by a flour-like substance. Depp then flew with the two agents to the Cincinnati area. Disembarking at the Cincinnati airport, Depp met Barone in the concourse from which they went to the baggage area. Depp carried the hair dryer with him and apparently handed it to Barone before purportedly going to check on the location of his luggage. Barone went to the parking lot and was arrested as he placed the hair dryer in the trunk of his car.

Based upon the foregoing facts and upon interrogation of Depp, one of the agents, Augustine Ginetz, filed an affidavit with the state judge which contained the following statement:

> This affiant received information from an informant, who has provided me with information which has been reliable and on which arrest have (sic) been based and a considerable quanity (sic) of narcotics have (sic) been conficated (sic) on July 6th and 7th of 1975. The informant further states on this date, July 7th 1975, that on June 30th 1975, he was at the residence at 2575 Indian Creek Rd and personally observed a large quanity (sic) of marijuana, cocaine, amphetamines and barbituates which belong to John Joseph Barone, Jr., who is a resident at this address. The informant further states that on June 30th 1975 that John Joseph

Barone, Jr., did give him $10,000.00 to go to Columbia (sic), South America to use to purchase cocaine, which he did. John Joseph Barone, Jr. was arrested by Federal Agents on July 7th 1975 when taking possession of the above purchase of cocaine. The informant further states that there is (sic) still large quanites (sic) of drugs at the residence at 2575 Indian Creek Rd, which he observed on June 30th 1975.

At a suppression hearing before the district court, counsel for Barone urged that certain statements concerning the reliability of the "informant" were false. Counsel also claimed that the allegation in the affidavit regarding the informant's observation of certain drugs at Barone's house was false. The government admitted that the unidentified informant was in fact Depp. After hearing the evidence, the district judge denied the motion to suppress, holding that the informant was reliable and that, whatever the truth might have been concerning whether the informant actually observed a large quantity of drugs in Barone's residence on June 30, 1975, he had in fact made that statement to the officer.

On appeal Barone makes two claims with respect to the validity of the search warrant. While he admits that the affidavit was facially sufficient to meet the two-prong test of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), he claims that Agent Ginetz intentionally misrepresented facts in the affidavit. He also claims that, in looking behind the face of the affidavit, the true facts as shown at the hearing on the motion to suppress were not sufficient to support probable cause.

In *United States v. Luna*, 525 F.2d 4 (6th Cir. 1975), *cert. denied*, 424 U.S. 965, 96 S.Ct. 1459, 47 L.Ed.2d 732 (1976), our court dealt with the problem of whether a search warrant may be invalidated where it is claimed that the statements in the affidavit, which appear sufficient to establish probable cause on their face, are in fact not true:

> [I]t must be recognized that law enforcement agents presenting evidence to magistrates could make a mockery of the magistrate's role if, in the necessarily ex parte proceeding, they could freely employ false allegations in order to secure the warrant. The same could likewise be true if the agents could, with impunity, draft affidavits with utter recklessness as to truth or falsity. In either instance there would be a lack of good faith in the performance of the agent's duty to the judicial officer.

> There are two circumstances which we believe authorize the impeachment of an affidavit which on its face is sufficient probable cause for issuance of the warrant. The first of these consists of knowing use of a false statement by the affiant with the intent to deceive the court. This is true even if the statement can be said to be immaterial to the issue of probable cause. In our judgment such perjury must lead to suppression of the evidence in order to prevent fraud upon the judicial process.

> The second circumstance arises when a law enforcement agent recklessly asserts a statement essential to establishment of probable cause and the charge is subsequently made that the statement is both false and recklessly made. In alleging recklessness, the movant must offer affidavits 1) that the statement sought to be attacked was false when made, and 2) that when made the affiant did not have reasonable grounds for believing it. At a hearing on such a charge, it will be important for the District Judge to determine whether means had been available to the agent to establish the truth or falsity of the statement without such delay as would defeat a legitimate law enforcement purpose.

> On the other hand, we do not believe that good faith error in a carefully prepared search warrant affidavit should be held to require suppression of evidence even where the erroneous allegation was essential to establishment of probable cause. As we see the matter, the suppression rule can hardly be expected to prevent human error. It should be em-

ployed to strike down perjury and to promote careful police work.

525 F.2d at 8–9.[1]

The Supreme Court has also recently addressed the issue of when a defendant may attack the veracity of a warrant affidavit after the warrant has been issued and executed. In *Franks v. Delaware*, —— U.S. ——, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Court summarized its ruling:

> [W]e hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

—— U.S. at ——, 98 S.Ct. at 2676.

■ In striking a balance between competing considerations the Court adopted a similar standard, but one that is more limited than *Luna*, in regard to when exclusion of the seized evidence is mandated. In *Luna* we decided that a knowing and intentional use of a false statement by the affiant will invalidate the warrant, even if the representation is immaterial to the probable cause determination. However, it is clear that *Franks v. Delaware* requires that, even in such an instance of perjury, the warrant will be voided only if the false statement is necessary to establish probable cause. The defendant must prove "by a preponderance of the evidence" that the "affidavit's remaining content is insufficient to establish probable cause." Thus a defendant must now look to *Franks v. Delaware* for the correct standard when seeking to attack a search warrant on this basis.[2]

Barone claims that the only information possessed by Ginetz at the time he made out the affidavit was that obtained from the surveillance, search, and interview of Depp in Miami and the arrest of Barone at the Cincinnati airport. At trial Ginetz admitted that he met "informant" Depp for the first time on July 7, 1975, shortly after Barone had been arrested and that prior to the time of his arrest Depp had never furnished the government with any information. For these reasons alone defendant insisted in the district court that the warrant affidavit was false insofar as it stated that Depp had "provided me with information which has been reliable." On appeal Barone suggests for the first time additional reasons for finding inaccuracies in the affidavit concerning the informant's reliability. He argues that it was false to state

---

1. Our circuit has on at least two other occasions had an opportunity to apply the rule in *Luna*. In *United States v. Rosenbarger*, 536 F.2d 715, 720 (6th Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977), we held that there was no basis for suppression where the affiant was not aware of an inaccuracy in his statement and there was no evidence that the false information was recklessly asserted. And, in *United States v. Roberts*, 548 F.2d 665 (6th Cir.), *cert. denied*, 431 U.S. 920, 97 S.Ct. 2188, 53 L.Ed.2d 232, 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246, 433 U.S. 913, 97 S.Ct. 2984, 53 L.Ed.2d 1098 (1977), Judge Lively, speaking for the court, held that certain inaccuracies in the affidavit were not material to the issue of probable cause and resulted from a good-faith error.

2. The dissent suggests that our court should exercise its supervisory powers to retain the stricter standards of *Luna* for application to federal prosecutions. Since our opinion here finds the search and seizure lawful under either standard, we need not definitively address this issue. At the same time, it is worth observing that dual standards in this field of law pose particular difficulties for law enforcement officers since with great frequency federal prosecutions must rely upon evidence gathered by state and local law enforcement officials. Here, of course, the affiant was a federal officer, but the warrant was issued by a state judicial officer.

that the informant's information led to arrests and seizures of narcotics on Juiy 6th and 7th. The only relevant arrests on July 6th were those of Depp and Sly, and Depp's information could not have contributed in any manner, Barone contends, to his own arrest and his companion's. Similarly, the seizure of cocaine on July 6th occurred before Depp had even been arrested. Finally defendant claims that it was inaccurate to state that a drug seizure occurred on July 7th, because at most the DEA agents recovered the very cocaine they had placed in Barone's hands.

We can agree that the facts recited in the affidavit could more accurately and fully have reflected the source of the affiant's information and the basis for probable cause. At the same time, we take into account the admonition of the Supreme Court in *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), that:

> [W]hen a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a common-sense, manner.

■ Applying the test of either *Franks v. Delaware* or *Luna*, we conclude that the district judge did not err in refusing to suppress the evidence.[3] Any inaccuracies in the affidavit statement concerning the arrests and seizures were minor. The statement itself contains some ambiguity as to its meaning, and we think it was the product of inartful drafting, rather than any intent to deceive the state judge. In addition, the facts in the affidavit adequately show the informer's reliability. That some of the statements necessarily were against the penal interest of the informant weighs heavily in support of his reliability and is, we have held, a "significant, and sometimes conclusive, reason for crediting the statements of an informant." *Armour v. Salisbury*, 492 F.2d 1032, 1035 (6th Cir. 1974). The specific details recited by the informant concerning his relationship with Barone, corroborated by the agent's own personal contact with the informant, adds substantial weight to his reliability. Counsel's assertion that the informant did not visit Barone's home on June 30, 1975 finds support only in the testimony of Barone, not in the testimony of Depp. Whether Depp in fact entered the home on that date and observed the contraband, the testimony was undisputed that Depp stated to Ginetz that he had observed drugs in Barone's residence on that occasion. The trial judge held a full and fair evidentiary hearing. His findings, made after personally hearing the witnesses, are not clearly erroneous.

## GRAND JURY INDICTMENT PROCEDURE

Barone was arrested on July 7, 1975. Thereafter a complaint was filed against him in the United States District Court for the Southern District of Ohio. After a preliminary hearing on July 22, 1975, the case was presented to the grand jury for the Southern District of Ohio, which heard testimony in September and December of 1975, and apparently again in March, 1976. While at least ten persons appeared before the grand jury, a "no bill" was returned on April 1, 1976. Thereafter, the matter was presented to a second grand jury, which was empaneled by the United States District Court for the Eastern District of Kentucky. At this proceeding only one witness, DEA Agent Thomas Powell, testified. The instant indictment was then returned against Barone charging both conspiracy and the substantive offense of possession with intent to distribute the cocaine.

3. For the purposes of this appeal we assume that the issue of the search warrant's validity is properly before us. However, we note that Rule 12, Fed.R.Crim.P., requires that a motion to suppress be made prior to trial and states that the failure timely to raise such an objection shall constitute a waiver. Upon a showing of "cause" though, the Rule allows the court to consider an untimely motion. Here, the suppression motion was not made until mid-way through the trial, and while the record does not suggest an explanation for the delay, the trial judge's ruling indicates that he may have implicitly found reasons to waive the requirement.

Defendant filed two pretrial motions seeking to have the indictment dismissed or quashed. Allegations of a violation of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.,* which were embodied in the first motion, are not raised on this appeal. The second motion, orally denied by the district court, sought dismissal on the grounds that the prosecutor had failed to apprise the Kentucky grand jury of the fact that the matter had earlier been presented to a grand jury in Ohio, that a large number of witnesses had been presented to that grand jury, and that a no bill had been returned.

We do not, of course, know precisely why the grand jury failed to return a true bill in Ohio nor why the government sought first to present the facts in the Southern District of Ohio instead of in the Eastern District of Kentucky where the substantive offense and the arrest occurred. Since overt acts of the conspiracy occurred in both districts, it was proper to have presented the evidence to a grand jury in either district, although probably more logical to have done so in Eastern Kentucky. *See United States v. Prueitt,* 540 F.2d 995, 1006 (9th Cir. 1976), *cert. denied,* 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977).

Both the defendant and the government agree that federal law does not forbid the resubmission of evidence to a grand jury after one or more previous grand juries have refused to indict. *United States v. Thompson,* 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333 (1920). Likewise, the defense basically recognizes the general rule that a criminal indictment is valid even though it may have been based solely upon hearsay evidence. For an understanding of the historical background of grand jury proceedings, *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), is instructive:

The grand jury is an English institution, brought to this country by the early colonists and incorporated in the Constitution by the Founders. There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor.

The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes. Grand jurors were selected from the body of the people and their work was not hampered by rigid procedural or evidential rules. In fact, grand jurors could act on their own knowledge and were free to make their presentments or indictments on such information as they deemed satisfactory. Despite its broad power to institute criminal proceedings the grand jury grew in popular favor with the years. It acquired an independence in England free from control by the Crown or judges. Its adoption in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice. And in this country as in England of old the grand jury has convened as a body of laymen, free from technical rules, acting in secret, pledged to indict no one because of prejudice and to free no one because of special favor. As late as 1927 an English historian could say that English grand juries were still free to act on their own knowledge if they pleased to do so. And in 1852 Mr. Justice Nelson on circuit could say "No case has been cited, nor have we been able to find any, furnishing an authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof . . . ." *United States v. Reed,* 27 Fed.Cas. 727, 738, [No. 16, 134.]

In *Holt v. United States,* 218 U.S. 245, [31 S.Ct. 2, 54 L.Ed. 1021], this Court had to decide whether an indictment should be quashed because supported in part by incompetent evidence. Aside from the incompetent evidence "there was very little evidence against the accused." The Court refused to hold that such an indictment should be quashed, pointing out that "The abuses of criminal practice would be enhanced if indictments could be upset on such a ground." 218 U.S., at

248 [31 S.Ct. 2]. The same thing is true where as here all the evidence before the grand jury was in the nature of "hearsay." If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and .unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

350 U.S. at 362–63, 76 S.Ct. at 408–409 (footnotes omitted).

The continuing authority of *Costello* has been recently reaffirmed, at least in dictum, in *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), which upheld an indictment in the face of a charge that it was procured through illegally-obtained evidence:

The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence . . . .

414 U.S. at 344–45, 94 S.Ct. at 618. The principle has also been recently recognized in our own circuit in *United States v. Solimine,* 536 F.2d 703 (6th Cir.), *vacated on other grounds,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), *judgment modified,* 551 F.2d 124 (6th Cir. 1977).

■ Notwithstanding this formidable authority, appellant urges upon us a divergent view followed by the Second Circuit in *United States v. Estepa,* 471 F.2d 1132 (2d

Cir. 1972). There the Second Circuit reversed the defendants' convictions and remanded with instructions to dismiss an indictment which had been procured by what was held to be improper use of hearsay testimony. The record indicated that the hearsay declarant did not, in his testimony before the grand jury, make it clear that his testimony was not from his own personal knowledge but was rather based upon the observations of others. Noting the court's repeated dissatisfaction with the continued, excessive use of hearsay in obtaining indictments in the circuit, Judge Friendly. observed:

The many opinions in which we have affirmed convictions despite the Government's needless reliance on hearsay before the grand jury show how loathe we have been to open up a new road for attacking convictions on grounds unrelated to the merits. We have been willing to allow ample, many doubtless think too ample, latitude in the needless use of hearsay, subject to only two provisos— that the prosecutor does not deceive grand jurors as to "the shoddy merchandise they are getting so they can seek something better if they wish," *United States v. Payton, supra,* 363 F.2d [996] at 1000 [(2d Cir.)] (dissenting opinion), or that the case does not involve "a high probability that with eyewitness rather than hearsay testimony the grand jury would not have indicted."

\*    \*    \*    \*    \*    \*

We had hoped that, with the clear warnings we have given to prosecutors, . . . and the assurances given by United States Attorneys, see *United States v. Arcuri, supra,* 405 F.2d [691] at 693 & n.4 [(2d Cir.)], a reversal for improper use of hearsay before the grand jury would not be required.

471 F.2d at 1137 (citations omitted).[4]

Barone does not assert the violation of a specific constitutional right. Instead he

---

4. The only case in our circuit discussing this Second Circuit line of authority is *United States v. Fife,* 573 F.2d 369 (6th Cir. 1976), which did not consider the wisdom of the *Este-*

urges that we should exercise our supervisory powers to reverse and direct the dismissal of the indictment because the totality of circumstances here were unfair. While he does not directly claim that Agent Powell led the Kentucky grand jury into a mistaken belief that his testimony was entirely firsthand, he complains that the failure to record the grand jury minutes and restrictions on his cross-examination of a government witness, Agent Powell, effectively precluded him from exposing any irregularities in the proceedings.[5] Finally, he claims it was unfair to seek and obtain through the hearsay evidence of one federal agent what could not be obtained through the direct testimony of ten eyewitnesses.

While we are not disposed to follow the rule of the Second Circuit in *Estepa,* we observe that the standards set forth by Judge Friendly in that case were not violated here in any event. There is not the slightest indication, and Barone has never contended, that Agent Powell deceived the grand jury during his testimony. He was, in fact, an eyewitness to many of the circumstances which occurred, and he was one of the agents who participated in the arrest of Barone.

From an examination of the record, it also appears that whatever the propriety of the trial court's ruling excluding testimony concerning Agent Powell's testimony at the first grand jury proceeding, the defense, by rephrasing the questions, was able to elicit fully the answers it desired.[6] Finally, while we have expressed our observation that it would be a better practice to make and preserve a record of grand jury testimony, this has never been required, and there is nothing in the facts here which disposes us to change this well-established rule of our circuit. *United States v. Solimine, supra,* 536 F.2d at 707; *United States v. Allen,* 522 F.2d 1229 (6th Cir. 1975), *cert. denied,* 423 U.S. 1072, 96 S.Ct. 854, 47 L.Ed.2d 82 (1976); *United States v. Battisti,* 486 F.2d 961, 963 (6th Cir. 1973).

In conclusion, while we do not foreclose the possibility of an abuse of the grand jury system so egregious as to warrant intervention by the use of our supervisory powers, such a circumstance clearly does not exist here, and we are not inclined to adopt the position of the Second Circuit in *Estepa.* The strong historical policy considerations pointed out by the Supreme Court in *Costello* persuade us that this is the correct result. We are especially reluctant to see the trial of criminal cases further attenuated by preliminary trials concerning the adequacy of the grand jury proceedings, a concern particularly noted in *Costello.*

## THE MOTION FOR A NEW TRIAL

■ Finally, defendant has appealed from the denial of his motion for a new trial, claiming that a later investigation showed that an answer given by the chief prosecution witness, Depp, was in fact false and that the government's failure to deliver this information to the defense violated the requirement of the Due Process Clause as enunciated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

---

*pa* rule as the facts therein did not present such a claim.

**5.** Near the end of the government's case at trial, Agent Powell testified, out of the jury's presence, concerning his participation in the second grand jury proceeding. He stated that he had presented the investigatory file on Barone to the United States Attorney's office in Kentucky and informed one of the Assistant United States Attorneys that a Cincinnati grand jury had returned a no bill. He implicitly conceded that he had been the sole witness to testify before the Kentucky grand jury.

Barone's attorney asked Agent Powell what information he had furnished to the second grand jury which the first grand jury did not possess and which he acquired after the date of the arrest. Apparently this inquiry was made in an effort to show that the second grand jury did not receive additional incriminating evidence and thus it would have likewise returned a no bill *if* excessive hearsay testimony by Powell had not been presented. The government objected to this question. The court sustained the objection regarding what Powell's actual testimony had been, but allowed him to state that basically he had no personal knowledge of additional inculpatory information that was discovered after the first grand jury proceeding.

**6.** See footnote 5 *supra.*

The newly-discovered evidence was that one Mary Shaberg, a female who lived with Depp at the time he was arrested, gave testimony during the first grand jury proceeding which was inconsistent with that given by Depp, concerning who, in fact, Depp had called by telephone when he arrived in Miami from Colombia, but prior to his arrest. In a carefully written opinion, the district judge, examining the evidence in the light of the other proofs at trial, denied the motion, holding that at best the testimony showed a discrepancy which, while it may have had some bearing upon Depp's credibility, did "not create a reasonable doubt of guilt that did not otherwise exist after the trial, and, therefore, the omission does not amount to constitutional error." The district court was clearly correct in denying the motion.

Affirmed.

KEITH, Circuit Judge, dissenting.

I respectfully dissent. Appellant claims that DEA Agent Ginetz intentionally misrepresented certain facts in his affidavit to support the issuance of the search warrant to search appellant's residence. Appellant argued at the suppression hearing that statements contained in the affidavit concerning the reliability of the unidentified informant were false. Agent Ginetz obtained the search warrant based upon the following affidavit:

*This affiant received information from an informant, who has provided me with information which has been reliable and on which arrest have (sic) been based and a considerable quanity (sic) of narcotics have (sic) been conficated (sic) on July 6th and 7th of 1975. The informant further states on this date, July 7th 1975, that on June 30th 1975, he was at the residence at 2575 Indian Creek Rd and personally observed a large quanity (sic) of marijuana, cocaine, amphetamines and barbituates which belong to John Joseph Barone, Jr., who is a resident at this address. The informant further states that on June 30th 1975 that John Joseph Barone, Jr., did give him $10,000.00 to go to Columbia (sic), South America to use to purchase cocaine, which he did. John Joseph Barone, Jr., was arrested by Federal Agents on July 7th 1975 when taking possession of the above purchase of cocaine. The informant further states that there is (sic) still large quanites (sic) of drugs at the residence at 2575 Indian Creek Rd, which he observed on June 30th 1975.* (Emphasis Added)

The government admitted that Depp was the informant referred to in the affidavit.

In *United States v. Luna,* 525 F.2d 4 (6th Cir. 1975), *cert. denied* 424 U.S. 965, 96 S.Ct. 1459, 47 L.Ed.2d 732 (1976), this Court set down a test which sought to deter police misconduct and safeguard the integrity of the judicial process. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *United States v. Luna, supra* at 8–9. We pointed out that law enforcement agents, if unchecked, could make a mockery out of a judicial officer's duty to reach a decision on the issuance of a search warrant in a neutral and detached manner. *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). This would be so if law enforcement agents were permitted to "employ false allegations in order to secure" search warrants and "if the agents could, with impunity, draft affidavits with utter recklessness as to truth or falsity." *United States v. Luna, supra* at 8.

Agent Ginetz admitted at trial that he met Depp, his informant, for the first time shortly after appellant Barone had been arrested and that Depp had never furnished the government with information in the past. Nevertheless, Agent Ginetz stated in his affidavit that Depp had provided him with reliable information upon which arrests had been made and narcotics confiscated on July 6 and 7, 1975. The only arrests made on July 6 were those of Depp and Sly, and Depp's information could not have contributed to his own arrest or that of his companion, Sly. The only arrest made on July 7 was that of appellant Barone, which took place prior to the time that Agent Ginetz met Depp. Moreover, the seizure of drugs at the Miami Airport was

made prior to Depp's arrest. The arrests and confiscation of drugs therefore were made in spite of, not because of, Depp.

In my view, the inaccuracies and ambiguities contained in Agent Ginetz's affidavit were more than merely the product of inartful drafting, and I fail to see how the majority can characterize them as minor. The statements appear to have been falsely made and a deliberate obfuscation of the truth in order to show the credibility and the reliability of the informant and thus meet the second prong of the test of an affidavit's sufficiency as announced by the Supreme Court in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). See also, *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

The *Luna* test articulated two circumstances which justify impeachment of an affidavit. The first circumstance goes to knowing use of false statements; the second goes to reckless use of false statements. Under the first application of *Luna,* this Circuit said:

> There are two circumstances which we believe authorize the impeachment of an affidavit which on its face is sufficient probable cause for issuance of the warrant. The first of these consists of *knowing use of a false statement by the affiant with intent to deceive the court.* This is true even if the statement can be said to be immaterial to the issue of probable cause. In our judgment *such perjury must lead to suppression of the evidence in order to prevent fraud upon the judicial process.* (Emphasis added)

525 F.2d at 8. Here Agent Ginetz, the affiant, stated that Depp had provided "*me* with information" (emphasis added) which had been reliable and upon which arrests had been made and narcotics confiscated. This statement was within the personal knowledge of the affiant and goes to the integrity of the affidavit. *Franks v. Delaware,* —— U.S. ——, ——, 98 S.Ct. 2674,

57 L.Ed.2d 667 (1978); *Rugendorf v. United States,* 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). The *Franks* decision set a minimum constitutional standard under which the Fourth Amendment mandates suppression of seized evidence in state and federal prosecutions. In my view *Franks* does not invalidate the concern expressed in this Circuit's decision in *Luna* that where a falsely drawn affidavit perpetrates fraud upon and makes a mockery of the judicial process, the affidavit may be impeached.[1] In *Luna* this Circuit enunciated a stricter standard to address this evil. In the exercise of this Court's supervisory powers, the *Luna* test should be applied in federal prosecutions. The motion to suppress here should have been granted and the conviction should be reversed.

---

1.  *United States v. Roberts,* 548 F.2d 665 (6th Cir.), *cert. denied,* 431 U.S. 920, 97 S.Ct. 2188, 53 L.Ed.2d 232 (1977), and *United States v.* *Rosenbarger,* 536 F.2d 715 (6th Cir. 1976), *cert. denied,* 431 U.S. 935, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977), do not suggest a different result.